IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MALIK WILLIAMS** | : | |
| | : | **CIVIL ACTION** |
| v. | : | No. 23-2348 |
| | : | |
| **P/O PATRICK DOOLEY** | : | |

**McHUGH, J.**                                                                                       **October 8, 2024**

## MEMORANDUM

This is a *pro se* civil rights case against Philadelphia Police Officer Patrick Dooley. Plaintiff Malik Williams brings several claims related to an arrest on November 7, 2021, which later culminated in the dismissal of all charges. Mr. Williams alleges that Dooley used excessive force, falsely arrested Williams, and maliciously prosecuted him, in violation of the Fourth Amendment of the U.S. Constitution. Officer Dooley now moves for summary judgment on all counts. For the reasons that follow, I am obligated to grant Dooley's motion.

**I.     The Factual Record**

Although Mr. Williams failed to respond to the Motion for Summary Judgment and has not sought an extension,[1] I must consider all facts on the record in a light most favorable to Williams. On November 7, 2021, Defendant Police Officer Dooley was alone in a marked patrol car traveling eastbound on Adams Avenue. Def. Ex. 6, Investigation Rep. at 1 (ECF 23); Def. Ex.

---

[1] More than three months have passed since the motion was filed and served. Local Rule 7.1(c) allows motions without timely responses to be granted as uncontested, E.D. Pa. Rule 7.1(c), but a district court cannot grant a defendant's motion for summary judgment solely on the finding that a plaintiff's response was insufficient. *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990). Instead, an unanswered motion for summary judgment can only be granted by "finding that judgment for the moving party is 'appropriate.'" *Id*. In cases like the one at hand "[w]here the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law." *Id*.

10, Dooley Body Cam. 0:00-1:05.  Some of the events of that night were captured on a body camera worn by the officer.  According to Officer Dooley, as he was driving, he saw a red Chrysler Pacifica stopped mid-block in traffic.  Investigation Rep. at 1.  In his report of the incident, Officer Dooley states that he saw two men jump out of the vehicle, then re-enter the vehicle after he drove past.  Investigation Rep. at 1; Def. Ex. 13, Mockus Body Cam. 4:07-4:15; Dooley Body Cam. 13:16-13:26. After driving past, Dooley checked the license plate of the Chrysler in the police database, and the vehicle was listed as stolen.  Investigation Rep. at 1; Mockus Body Cam. 4:09-4:15. Dooley made a u-turn to return to the vehicle, and later reported to another officer on scene that, when he arrived back at the vehicle, the same two men had exited the Chrysler and were walking away.  Mockus Body Cam. 4:09-4:30; Investigation Rep. at 1; Dooley Body Cam. 0:18-0:24. Dooley believed that they walked into a nearby Sunoco and he contemporaneously relayed that information over police radio.  Dooley Body Cam. 1:05-1:08; Mockus Body Cam. 4:45-4:49; Investigation Rep. at 1.

Officer Dooley then drove into the Sunoco parking lot and saw two men – Malik Williams and someone known as "D" – exiting the Sunoco.  Dooley Body Cam. 1:03-1:17; Williams Dep. 23:24-26:19.  He can be heard reporting this observation by radio.  According to Mr. Williams, he and D were stopping at the Sunoco on their way home after being at a barbershop.  Williams Dep. 23:24-26:19. Officer Dooley, however, believed Williams and D were the same two men he saw leave the stolen vehicle and walk into the Sunoco.  Investigation Rep. at 1; Dooley Body Cam. 1:04-1:08, 6:14-6:17, 8:46-8:55; Mockus Body Cam. 4:45-4:49.  Once again, this conclusion on the officer's part was contemporaneously recorded.  Dooley left his patrol car and instructed D and Williams not to move and to "get on the ground."  Dooley Body Cam. 1:12-2:02.  D immediately ran away from the Sunoco.  *Id*.; Williams Dep. 26:20-21.  Williams remained but did

not comply with Dooley's repeated instructions to "get on the ground." Dooley Body Cam. 1:16-2:02.

After numerous instructions were not followed, Dooley grabbed Williams' arm to attempt to restrain him, pinned him against a car, and used force to try to secure Williams' hands into handcuffs. *Id.* 1:40-4:47; Def. Ex. 11, Fiallos Body Cam. 1:04-3:04. While Williams was pinned against the car, other officers arrived. Fiallos Body Cam. 1:04-3:04. Body worn camera footage shows that Williams continued to resist arrest despite multiple officers commanding him to stop resisting and to put his hands behind his back. *Id.*; Dooley Body Cam. 2:02-4:47. After Dooley successfully handcuffed Williams, an Officer kept a hand on Williams while Dooley checked his pockets. Dooley Body Cam. 4:45-5:41. Multiple officers walked Williams to a patrol car, instructed him to "sit down," and then pushed him into the car when he did not comply. *Id*. 5:41-6:14; Williams Dep. 39:6-13.

Around ten minutes later, multiple officers transferred Williams from the patrol car into a police transport van, while Williams, by his own admission, continued to resist. Williams Dep. 40:12-14; Mockus Body Cam. 0:08-1:18 (showing Williams resist and say, "I'm not getting in here."). At some point while Williams was being placed inside the transport van, Williams also spat. Williams Dep. 41:2-19; Mockus Body Cam. 1:19-1:34. An assisting officer, who was restraining Williams' right shoulder as he was being loaded into the van, is seen on a body worn camera pointing to his head and stating that he was hit on the side of the head with spit. Mockus Body Cam. 0:15-0:25, 2:30-2:35. After Williams was secured, Officer Dooley returned to the red Chrysler. Dooley Body Cam. 12:30-15:00. Body camera footage shows what was later identified to be ultrasound machines that had been reported as being in the Chrysler when it was stolen. Def. Ex. 3, Vehicle Theft Report; Dooley Body Cam. 14:05-14:10.

At deposition, the only injury Williams recounted from the encounter was numbness in his hands lasting approximately twenty-five minutes.  Williams Dep. 42:10-12, 23-24.  In his complaint, Williams pleaded that a later x-ray revealed that his hands were not broken.  Compl. at 9 (ECF 2).

Mr. Williams initially sued Police Officer Dooley, the Philadelphia Police 15th District, Philadelphia District Attorney Larry Krasner, and the Honorable Henry Lewandowski. Only the claims against Officer Dooley remain.

## II.     Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    Discussion

### A.  Excessive Force

Mr. Williams first claims that Officer Dooley used excessive force during his arrest, violating his Fourth Amendment rights.  Given the record, I conclude that no reasonable jury could find that the force used was excessive.

Claims that a police officer used excessive force while making an arrest are "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)).  This inquiry must take into account "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)).  Courts must also assess physical injury to the plaintiff, the duration of the

action, and the possibility that the plaintiff may have been violent or armed. *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020). These factors are not exclusive, and ultimately the reasonableness of force depends on the "totality of the circumstances." *Graham,* 490 U.S. at 396.

On the evidence here, no reasonable jury could conclude that the force Dooley used to arrest Williams was objectively unreasonable. Dooley identified Williams as someone alighting from a stolen car, suggesting to him that Williams may have committed a crime. Although there was no indication that Williams had a weapon, body cam footage confirms that he physically resisted arrest during the entire encounter and failed to follow repeated instructions. Dooley Body Cam. 1:12-6:14; Williams Dep. 27:20-22, 28:6-7, 29:18-23, 31:24-32:439:10-13, 40:12-14. When Dooley first left his patrol car as the only officer on site, he instructed Williams not to move and to "get on the ground" as Williams' companion fled. Dooley Body Cam. 1:12-2:02. After instructing Williams to get on the ground over a dozen times and threatening Williams with a taser if he did not comply, Williams remained standing. *Id.* Only then did Dooley grab Williams' arm and started walking him towards a nearby vehicle. *Id.* 1:30-2:10. Williams continued to resist, pulling his arms and body away from Dooley, who continued to attempt to restrain Williams. *Id*. 2:02-2:31. Dooley allegedly then "put his foot in front of [Williams'] and kneed [Williams'] legs." Williams Dep. 32:1-2. But Williams admitted to "struggling with Police Officer Dooley" and that "[Williams] was snatching away from him." *Id*. 29:18-23.

Dooley secured Williams against the vehicle and repeatedly instructed Williams to put his arms behind his back. Dooley Body Cam. 2:02-4:47. Williams continued to resist, and it took over two minutes, sixteen instructions to "put your hands behind your back," numerous instructions to "stop resisting," and three officers to successfully handcuff him. *Id.* 2:02-4:47; Fiallos Body Cam. 1:04-3:04. During this time, Williams claims that Dooley "pinned [him] against the car, banged

[his] head on the car, twisting [his] arms, trying to get [him] in handcuffs." Williams Dep. 27:1-4. Williams' resistance was partially successful: while pinned against the car, Williams kept a hand free and placed a call on his cellphone. *Id.* 34:22-35:9. Although Williams claims that Dooley's elbow ended up on his neck "during the struggle," and that Dooley was "kneeing [Williams's] legs to try to get [him] to fall," *id*. 32:6-8, Williams admits that much of the force was used "trying to get [him] in handcuffs." *Id.* 27:1-4. Williams also admits that Dooley's elbow was against his neck because Dooley "was trying to restrain me." *Id*. 33:18-21. Even after other officers arrived, Williams recounted, "I still wouldn't get on the ground" and admits that he continued to resist. Williams Dep. 28:6-7. Body camera footage and Williams' own testimony demonstrates that, while some force was used, it was soley meant to restrain Williams, and no force exceeded what was necessary for that purpose. Dooley Body Cam. 2:02-4:47; Fiallos Body Cam. 1:04-3:04.

After Williams was restrained, body camera footage shows that other force was used to secure Williams in a patrol car and police transport van as he resisted and failed to comply with instructions. After being handcuffed and searched, multiple officers walked Williams to a patrol car, instructed him to "sit down," and then other officers – not Dooley – pushed him into the car when he did not comply. *Id*. 4:45-6:14; Williams Dep. 39:6-13. Around ten minutes later, multiple officers transferred Williams from a patrol car into a transport van, to which Williams admits, "I resisted to that." Williams Dep. 40:12-14; Mockus Body Cam. 0:08-1:18 (showing Williams stating, "I'm not getting in here"). As a result, the officers had no reasonable choice except to hold onto Williams and push him into the van. Mockus Body Cam. 0:08-1:34.

Fortunately, Mr. Williams was not injured during this encounter, as his only injury was transient numbness in the hands. Williams Dep. 42:10-12, 23-24. As noted above, an x-ray revealed that his hands were not broken. Compl. at 9.

Considering Williams' undisputed, continuous physical resistance, no reasonable jury could conclude that Officer Dooley's use of force was objectively unreasonable. Footage shows that force was only used in response to Williams' failure to comply, was used for the limited purpose of restraining him, did not exceed what was necessary to restrain him, did not cause any meaningful injury, and only lasted as long as was necessary to restrain, search, and secure him. As such, summary judgment is warranted as to the excessive force claim.

**B. False Arrest**

Williams next claims that Dooley did not have enough evidence to arrest him, in violation of his Fourth Amendment Rights. As to this claim, there is also no genuine issue of material fact, and no reasonable jury could conclude that the officer lacked probable cause.

To establish a claim for false arrest under the Fourth Amendment, a plaintiff must allege facts establishing that he was arrested without probable cause. *See Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995); *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti,* 71 F.3d at 483. And "[a]lthough the probable cause inquiry is usually a question for the jury, courts 'may conclude in the appropriate case . . . that probable cause did exist as a matter of law if the evidence, viewed most favorable to [the] [p]laintiff, reasonably would not support a contrary finding.'" *Karns v. Shanahan*, 879 F.3d 504, 523 (3d Cir. 2018) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401

(3d Cir. 1997)).  So long as probable cause exists as to one charge, a claim of false arrest will fail. *See Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) ("Probable cause need only exist as to any offense that could be charged under the circumstances."); *Johnson v. Knorr,* 477 F.3d 75, 82 (3d Cir. 2007).  Here, the undisputed evidence of record supports probable cause as a matter of law.

Mr. Williams was arrested for three crimes against property: Theft by Unlawful Taking of Movable Property (18 Pa. Cons. Stat. § 3921), Receiving Stolen Property (18 Pa. Cons. Stat. § 3925), and Unauthorized Use of Automobiles (18 Pa. Cons. Stat. § 3928).  The record reflects that Officer Dooley identified a stolen vehicle while on patrol and doubled back to investigate.  He identified two men he believed had been in the vehicle and attempted to follow them.  As he attempted to stop them, one fled and Mr. Williams refused his commands.  This combination of events would lead a reasonable person to believe: (1) Williams had been in the stolen vehicle, (2) may have either stolen the vehicle or received it, and (3) at a minimum was using the vehicle without the permission of the owner.  Separately, the ultrasound machines that were reported stolen were in the vehicle in which Dooley believed Williams had been riding.

Williams has not offered or pointed to any evidence that could refute Dooley's reasonable belief that Williams had committed a crime.  Admittedly, Mr. Williams testified that he "was never in the vehicle."  Williams Dep. 46:1-3.  But at this stage "we are concerned [] only with the question of probable cause, not [] guilt or innocence."  *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005).  The "constitutional validity of the arrest does not depend on whether the suspect actually committed any crime." *Id.* (citing *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003)).  Instead, the question is "whether the totality of the circumstances was sufficient to justify a reasonable belief on the part of the officers that [the Plaintiff] had committed a crime,"

8

which is far lower than the evidentiary standard required for conviction. *Id*. at 603. Looking at the evidence on the record in a light most favorable to Williams on all three charges related to the stolen car, no reasonable jury could find a lack of probable cause to arrest and charge Williams based upon Dooley's observations at the time.

Williams was separately charged with Simple Assault (18 Pa. Cons. Stat. § 2701) and Resisting Arrest (18 Pa. Cons. Stat. § 5104) on a complaint filed by Police Officer Michael Gates for spitting at him and resisting arrest. See Def. Exs. 2, 4, 7. The relevant evidence here was captured by body camera footage, showing Williams physically resisting arrest throughout the entire encounter. In his deposition, Williams repeatedly admitted that he physically resisted arrest. Additionally, as Mr. Williams was loaded into the transport van, the record is clear that he spat, and his spit appeared to hit an officer. Williams Dep. 41:2-19; Mockus Body Cam. 1:19-1:34, 0:15-0:25, 2:30-2:35. Although Williams claims he was not attempting to hit an officer, Williams Dep. 40:12-21, the body camera footage shows that (1) while Williams was resisting arrest, (2) he spat in the general direction of the officers, and (3) an officer indicated he was hit with spit. These facts would lead a reasonable person to believe that Williams intended to and did spit on an officer. Regardless, specific intent is not necessary to commit a simple assault; acting knowingly or recklessly is sufficient. 18 Pa. Cons. Stat. § 2701.

There is no doubt there was probable cause to arrest on more than one charge, and therefore Dooley is entitled to summary judgement.

**C. Malicious Prosecution**

Lastly, Williams claims that Dooley maliciously prosecuted him, violating his Fourth Amendment rights. Weighing the evidence on the record, no reasonable jury could find Williams' prosecution malicious.

9

A plaintiff asserting a constitutional malicious prosecution claim must establish that "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009). If a single element is not satisfied, the claim fails.

Although several charges against Williams resulted in dismissal or acquittal, to prevail on a malicious prosecution claim, Williams "must show that the officers lacked probable cause to arrest [him]." *Wright*, 409 F.3d at 604. Courts evaluate probable cause "charge by charge" because, unlike false arrest, a single charge without probable cause will allow a Fourth Amendment malicious prosecution claim to survive. *Chiaverini v. City of Napoleon,* 144 S. Ct. 1745, 1750-51 (2024). As discussed above, Williams has pointed to no evidence that would refute the existence of probable cause.

Furthermore, there is no evidence on the record suggesting Dooley "acted maliciously" or for "a purpose other than bringing the plaintiff to justice." *McKenna*, 582 F.3d at 461. Williams reiterates that he "was never in that vehicle" and notes that Dooley's body camera footage does not show Williams in the vehicle. Williams Dep. 46:1-3, 47:1-2. But Dooley's description of events that night captured contemporaneously on tape convey his conclusion that Williams had been in the vehicle. Dooley Body Cam. 1:05-1:08, 5:15-5:36, 6:14-6:17, 8:46-8:51, 15:18-15:25; Investigation Rep. at 1. Even if this represents an unfortunate case of mistaken identity, there is no evidence from which a jury could reasonably infer that the prosecution was malicious or for ulterior purposes.

**IV.     Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted in its entirety.  An appropriate order follows.

 /s/ Gerald Austin McHugh  
United States District Judge